**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CHANDER KANT | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civil Action No. 03-6135 (WHW) |
| | : | |
| SETON HALL UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Walls, Senior District Judge**

Plaintiff Chander Kant brings this action under 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII"), and New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD"), alleging that defendant Seton Hall University discriminated against him on the basis of his race and national origin and retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and filing a previous lawsuit against defendant. Plaintiff also asserts claims for breach of employment contract.

Plaintiff moves for partial summary judgment. Defendant moves for summary judgment on all counts. Having considered the parties' written submissions and oral arguments, the Court grants defendant's motion for summary judgment on the first, second and fourth counts. The Court dismisses the third count without prejudice. Pursuant to 28 U.S.C. § 1367(d), the statute

NOT FOR PUBLICATION

of limitations for plaintiff to bring his claims for breach of employment contract in state court will be tolled for thirty days after the date of dismissal.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, a naturalized United States citizen, was born in India and is of Indian origin. Defendant is an institution of higher learning in West Orange, New Jersey.  Defendant hired plaintiff in March 1989 as an associate professor in the Department of Economics of defendant's W. Paul Stillman School of Business (the "Business School") at Seton Hall University (the "University").  Plaintiff was granted tenure at the University in April 1992.

Plaintiff has applied for promotion from the rank of associate professor to full professor four times.  Before his fourth application for promotion, on August 21, 1998, he had filed an internal grievance and complaint against John Dall, Chair of the Economics Department ("Chairperson Dall") and Sheldon Epstein, then the Associate Dean of the Business School ("Associate Dean Epstein"), alleging that he had been subjected to national origin discrimination. Dolores Martin, then the Dean of the Business School ("Dean Martin"), denied his grievance on October 23, 1998.  Plaintiff appealed to Mark Rocha, then Provost of the University ("Provost Rocha"), who also denied his grievance.  Plaintiff further appealed to the Faculty Senate Grievance Committee.  The Grievance Committee issued a report denying his complaint on July 21, 1999.

During the pendency of plaintiff's internal grievance and complaint, he submitted his fourth application for promotion on October 1, 1998.  Once his application reached the

**NOT FOR PUBLICATION**

University Rank and Tenure Committee, the committee voted eight to one against his promotion. During the pendency of his grievance, he filed charges of national origin discrimination and retaliation against Defendant with the EEOC on June 14, 1999.  After receiving a "right to sue" letter from the EEOC on July 25, 2000, plaintiff filed the first of two lawsuits with this Court on October 23, 2000, <u>Kant v. Seton Hall University</u>, No. 00-5204 (D.N.J. Oct. 23, 2000) ("<u>Kant I</u>"). In <u>Kant I</u>, he alleged national origin discrimination and retaliation arising from the denials of his promotion applications and other benefits, such as release time, travel reimbursements, and paid leave.

During the pendency of <u>Kant I</u>, plaintiff filed charges of national origin discrimination and retaliation against defendant with the EEOC on November 4, 2002 and November 18, 2002. He believed that defendant continued to discriminate and retaliate against him for his filing of <u>Kant I</u> by denying him benefits, such as release time, travel reimbursements, and paid leave. Plaintiff received a "right to sue" letter from the EEOC on September 29, 2003.  On December 23, 2003, plaintiff filed this complaint with this Court and amended the complaint on February 24, 2005, <u>Kant v. Seton Hall University</u>, No. 03-6135 (D.N.J. Dec. 23, 2003) ("<u>Kant II</u>"), for alleged acts occurring after the filing of <u>Kant I</u>.

Plaintiff states that from January 2001 to June 2004, defendant unlawfully discriminated and retaliated against him by denying his requests for fringe benefits, requests for partial pay while on leaves of absence, a request for sabbatical, a request for an unpaid leave of absence, opportunities to present papers at professional conferences, and requests for reimbursements for travel expenses.  Plaintiff also states that defendant unlawfully assigned him to teach four courses

NOT FOR PUBLICATION

for the Spring 2002 semester, unlawfully issued a warning of dismissal, unlawfully issued a memo of caution for failing to attend a departmental open house, intentionally excluded his intellectual contributions to the University's Annual Report, intentionally changed the criteria for the University's faculty achievement awards to exclude him from winning an award, intentionally failed to evaluate his intellectual activities, unreasonably evaluated his research performance as one level below "outstanding," imposed unreasonable research obligations, and intentionally interfered with his application for a tenure position with Columbia University.

During the course of this lawsuit, plaintiff was represented by three different attorneys. Each of his attorneys successively withdrew from the case.  Plaintiff, now as a pro se litigant, moves for summary judgment on allegations listed in paragraphs 8 to 13 and 15 to 20 in his amended complaint.  Defendant moves for summary judgment on all counts and all allegations.

## DISCUSSION

### A.  Standard of Review for Summary Judgment

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party.  Pollock v Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the court is not "to weigh the evidence and determine the truth of the matter

**NOT FOR PUBLICATION**

but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249 (1986). A genuine issue of material fact exists only if the evidence presented

would enable a reasonable jury to return a verdict for the non-movant. See Anderson, 477 U.S.

at 248. Summary judgment must be granted if no reasonable trier of fact could find for the non-

moving party. See id. at 249.

The non-moving party may not defeat summary judgment by simply resting on the

argument that the record contains facts sufficient to support his claims. See Big Apple BMW,

Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 507 U.S.

912 (1995); O'Donnell v. United States, 891 F.2d 1079, 1082 (3d Cir. 1989). Rather, the non-

moving party must go beyond the pleadings and, by affidavits or other evidence, designate

specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324; Fed. R.

Civ. P. 56(e). Such affidavits must be based "on personal knowledge," establish "such facts

which would be admissible," and "show affirmatively that the affiant is competent to testify in all

matters stated therein." Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985); see also 6 J.

Moore, W. Taggert & J. Wicker Moore's Federal Practice § 56.22[1] (2d ed. 1985).

"[C]onclusory statements, general denials, and factual allegations not based on personal

knowledge [are] insufficient to avoid summary judgment." Olympic Junior, Inc. v. David

Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972); see also First Nat'l Bank of Ariz. v. Cities

Service Co., 391 U.S. 253, 288-90 (1968); Gostin v. Nelson, 363 F.2d 371 (3d Cir. 1966). To

prevail on a motion for summary judgment, the non-moving party must "make a showing

sufficient to establish the existence of [every] element essential to that party's case, and on which

**NOT FOR PUBLICATION**

that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.


**B.      42 U.S.C. § 1981**

In count one of the complaint, plaintiff alleges that defendant violated § 1981 by denying

benefits to him on the basis of his race as an Asian Indian while granting the same benefits to

non-Asian Indian faculty members.  Section 1981 prohibits racial discrimination in the making

and enforcement of contracts.  Brown v. Philip Morris Inc., 250 F.3d 789, 796 (3d Cir. 2001).

The courts analyze § 1981 claims under the McDonnell Douglas burden-shifting framework:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a
> prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the
> prima facie case, the burden shifts to the defendant "to articulate some legitimate,
> nondiscriminatory reason for the employee's rejection."  Third, should the defendant
> carry this burden, the plaintiff must then have an opportunity to prove by a
> preponderance of the evidence that the legitimate reasons offered by the defendant
> were not its true reasons, but were a pretext for discrimination.

Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

Plaintiff alleges thirteen acts of discrimination and retaliation in his amended complaint

(Complaint ¶¶ 8-20).  Plaintiff does not designate clearly which allegations support a claim for

discrimination and which for retaliation.  All thirteen factual allegations will be analyzed as

claims for retaliation.  Only factual allegations where plaintiff alleges all four essential elements

for a claim of discrimination will be analyzed as a claim for discrimination.

**1.      Discrimination Claim**

Plaintiff must allege facts supporting the following elements for a prima facie case for

discrimination: (1) he is a member of a protected class; (2) he was qualified for the benefit he

**NOT FOR PUBLICATION**

sought; (3) he was denied that benefit despite those qualifications (i.e., he suffered an adverse employment action); and (4) the benefit was provided to other similarly situated employees who were not in the protected class.  Jones v. School Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999).  Plaintiff's allegations satisfy the first and third elements.  He, as an Asian Indian, is a member of a protected class and sufficiently alleges that he was denied a benefit.

　　　　Defendant disputes the second and fourth elements in plaintiff's case for discrimination. Defendant also asserts that even if plaintiff can demonstrate a prima facie case of discrimination, he fails to prove by a preponderance of the evidence that defendant's legitimate nondiscriminatory reasons were a pretext for discrimination.  If defendant successfully articulates some legitimate, nondiscriminatory reason, plaintiff must rebut defendant's stated nondiscriminatory reasons as pretextual with "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006).

　　　　The Third Circuit has outlined the following standard as to the amount of evidence necessary to survive a motion for summary judgment:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  (Citations omitted.) Rather, the

NOT FOR PUBLICATION

>non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," (citations omitted), and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

<u>Fuentes</u>, 32 F.3d at 764 -65.

####    a.    Defendant Denied Plaintiff's Request for Fringe Benefits

Plaintiff complains that in January 2001, Karen Boroff, Dean of the Business School ("Dean Boroff"), and defendant denied his request for fringe benefits while granting the same benefits to non-Asian Indian faculty members (Complaint ¶ 8).  Plaintiff wrote an e-mail message to Dean Boroff on January 19, 2001 retroactively requesting fringe benefits for both the 1999-2000 and 2000-2001 academic year.  He wrote "[i]n my unpaid leave applications for both AY1999-2000, I had stated that I had applied for some fellowships.  However, I had not been granted either fellowship when Provost Rocha gave written approval of these leaves."  In the same e-mail plaintiff stated that by that time he had received fellowship awards.  He asserted that in his request he provided Dean Boroff with documentation that he had received fellowships during his leaves of absence.  Dean Boroff denied that plaintiff provided any documentation.  Dean Boroff considered his request as seeking her reversal of Provost Rocha's earlier denials of plaintiff's requests for fringe benefits during his unpaid leaves of absence.

During oral argument, plaintiff cited a July 30, 2000 letter from Dean Boroff to Acting Provost, Dr. Mel Shay, where plaintiff alleges that Dean Boroff coerced Provost Shay into denying plaintiff's request for fringe benefits.  Upon examination of the July 30, 2000 letter, the Court disagrees with plaintiff's characterization.  In this letter, Dean Boroff simply explained the

-8-

NOT FOR PUBLICATION

history and circumstances of plaintiff's requests for half pay during his leave of absence and the reasons why Provost Rocha and Dean Boroff had denied his requests.  There is no evidence of coercion.

Plaintiff further complains that Professors William Stoever and Frank Tinari, faculty members not in his protected class, received fringe benefits during their leaves of absence. Plaintiff claims that defendant preferentially treated Prof. Stoever by providing him with travel benefits during his leave of absence.  Plaintiff compares himself to Prof. Tinari in his claims of discrimination because Prof. Tinari received full benefits during the same period plaintiff requested fringe benefits.

Defendant states that plaintiff was not entitled to fringe benefits.  The University's Faculty Guide provides for the University's policies and procedures.  According to Article 6.2.f of the Faculty Guide, "[t]he continuation of the university's contribution to fringe benefits during the leave of absence shall depend upon the circumstances of the leave, and the precise status of the faculty member's benefits shall be stated in writing by the provost in the letter approving the leave of absence."  After reviewing Provost Rocha's decisions and the Faculty Guide, Dean Boroff believed that she did not have the authority to reverse Provost Rocha's decisions, which were made at the time of plaintiff's requests, and retroactively grant benefits to him.

Defendant disputes that it treats other faculty members better than plaintiff.  Defendant concedes that Prof. Stoever received travel money but argues that it is de minimis.  As to Prof. Tinari, defendant argues that Prof. Tinari was not on a leave of absence but rather had entered into a Reduced Compensation Agreement with the University.  According to the Reduced

**NOT FOR PUBLICATION**

Compensation Agreement, Prof. Tinari was obligated to teach two courses per semester in exchange for half his regular salary plus benefits during the life of the agreement.

Plaintiff has not alleged that Provost Rocha's earlier denials for fringe benefit was discriminatory.  Because plaintiff was ineligible for fringe benefits at the time he applied for his leaves of absence with Provost Rocha, Dean Boroff's reasons for upholding Provost Rocha's earlier denials are legitimate.  Plaintiff has not presented any evidence that a reasonable jury can conclude that Dean Boroff's reasons for denying his request for retroactive fringe benefits were a pretext for discrimination.  Accordingly, defendant's motion for summary judgment on this allegation is granted.

**b.    Defendant Denied Plaintiff's Request for Unpaid Leave of Absence**

Plaintiff alleges that in December 2001, Dean Boroff recommended against his request for an unpaid leave of absence for the 2002-2003 academic year while recommending leaves of absence and sabbatical leaves for non-Asian Indian faculty members (Complaint ¶ 9).  During the fall of 2001, plaintiff had applied for an unpaid leave of absence.  Chairperson Dall had placed before the Department of Economics plaintiff's application for an unpaid leave as per Article 6.1(b)(4) of the Faculty Guide, which provides that "[r]ecommendations based upon a majority vote of the total full-time faculty members in the department and/or committee . . . are submitted to the dean.  . . . Deans shall submit their recommendations to the provost.  . . . The provost shall take action" on the application for a sabbatical or leave of absence.  Chairperson Dall wrote in the November 1, 2001 letter to Dean Boroff and plaintiff that plaintiff's application for a "[l]eave of absence failed to get a majority of yes votes."  In the letter Chairperson Dall expressed concern

**NOT FOR PUBLICATION**

to Dean Boroff that several of the Department of Economics faculty members were contemplating retirement or resignation.  In the November 30, 2001 letter, Dean Boroff wrote to plaintiff that she will be recommending against his application for an unpaid leave of absence because of the Business School's staffing and operational needs for the 2002-2003 academic year.

One of the requirements for the recommendation of an unpaid leave of absence is a recommendation by a majority of the full-time faculty members in the Department of Economics. Plaintiff has not alleged that the majority of the full-time faculty members collectively discriminated against him.  Because the majority of the full-time faculty members recommended against plaintiff's request for an unpaid leave of absence and the Business School faced uncertain staffing needs, defendant's reasons for denying plaintiff's request for unpaid leave of absence were legitimate.  Plaintiff has not presented any evidence from which a reasonable jury can conclude that defendant's reasons for this denial was a pretext for discrimination.  Accordingly, defendant's motion for summary judgment on this allegation is granted.

       **c.**      **Defendant Denied Plaintiff's Request for Release Time**

Plaintiff alleges that in January 2002, defendant assigned plaintiff to teach four courses while assigning non-Asian Indian professors to teach fewer than four courses (Complaint ¶ 10). Defendant disputes the second element of the discrimination claim, stating that plaintiff was not qualified for release time.  Plaintiff argues that he was qualified to teach no more than three courses per semester for two reasons: (1) he was promised this benefit and (2) he was qualified for release time because he had/would have published an article pursuant to the <u>Faculty Guide</u>.

**NOT FOR PUBLICATION**

First, plaintiff asserts that George Tzannetakis, then Chair of the Economics Department ("Chairperson Tzannetakis"), promised the he would be assigned to teach no more than three courses per semester.  Plaintiff's offer letter for employment dated March 29, 1989, signed by the Business School's Dean at the time, Professor Frederick Kelly ("Dean Kelly"), provided that plaintiff's "maximum teaching load will be 12 credits per semester and will be assigned by the Department of Economics in consultation with me."

Despite the clear language in Dean Kelly's offer letter, plaintiff understood the terms of his teaching responsibility differently.  In an April 7, 1989 letter from plaintiff to Dean Kelly, he wrote "[b]ased on my conversations with Professor Tzannetakis, I understand that . . . my teaching load will be nine credits per semester with not more than two preparations a semester." Chairperson Tzannetakis responded in an April 19, 1989 letter correcting plaintiff's misunderstanding as to a summer research grant and stating that "the other expectations that you have and mention in your letter are correct."  Plaintiff argues that Chairperson Tzannetakis confirmed his belief that he was required to teach no more than nine credits per semester.  It is unclear whether Chairperson Tzannetikis had the authority to modify plaintiff's obligations from teaching twelve credits per semester to nine credits per semester in Dean Kelly's offer letter.

Defendant disagrees that it made any promise to plaintiff reducing his teaching responsibility.  Defendant cites to the <u>Faculty Guide</u> and two signed contracts between plaintiff and defendant as evidence that plaintiff's course load is twenty-four credits per academic year, which would translate into four three-credit courses per semester.  Article 7.3a of the <u>Faculty Guide</u> provides "[c]ourses are assigned to faculty members by the chairperson after consultation

**NOT FOR PUBLICATION**

with each faculty member, subject to the dean's review."  Article 7.3a of the <u>Faculty Guide</u>

provides "[t]he teaching load for full-time faculty members is twenty-four (24) credit hours per

academic year and shall normally be twelve (12) credit hours per academic semester."

 Defendant also argues that even if plaintiff received an oral promise to teach no more

than three courses per semester, that promise was voided by a subsequent term contract.

Defendant cites to two executed employment term contracts signed by plaintiff on Mach 19,

1989 (the "1989 Contract") and July 3, 1991 (the "1991 Contract"), one executed before and one

after plaintiff's alleged promise, which occurred in April 1989.  Both contracts provide in

paragraph 6 that "[t]he Faculty member shall teach twenty-four (24) credit hours during each

academic year, unless release time has been approved by the University."  Paragraph 12 of

the1991 Contract provides that "[t]his Term Contract supercedes and voids all previous notices

and/or Contracts the Faculty Member may have received from the University."

 New Jersey recognizes the validity of subsequent agreements to modify and/or supercede

earlier agreements.  <u>Rosenberg v. D. Kaltman & Co.</u>, 28 N.J. Super. 459, 463-64 (Ch.

1954)("The general rule is that a subsequent contract covering the same subject matter and made

by the same parties, but containing terms inconsistent with the former contract so that the two

cannot stand together, rescinds, supersedes and  substitutes for the earlier contract and becomes

the only agreement on the part of the parties on the subject matter.").  The 1991 Contract

superceded any alleged promise made to plaintiff and required him to teach twenty-four credits

per academic year.  Plaintiff cannot show that he was qualified for a course load of nine credits

per semester because of an alleged oral promise.

-13-

**NOT FOR PUBLICATION**

Second, plaintiff argues that he was eligible for release time.  Faculty members may be eligible for teaching load reductions pursuant to Article 7.5 of the <u>Faculty Guide</u> and pursuant to the Stillman Policy on Release Time for Intellectual Contributions.  Under the Policy on Release Time, faculty members are deemed qualified for release time if they meet the minimum scholarly activity standards.

Defendant disagrees that plaintiff met the minimum scholarly activity standards for eligibility for release time.  On August 1, 2001, Dean Boroff wrote to Chairperson Dall summarizing their conversation regarding plaintiff's 2000-2001 Faculty Annual Review and Plan ("FARAP").  During the FARAP process, the faculty member submits a profile which records, among other things, his research accomplishments for a preceding period and sets forth his development plan for the upcoming academic year.  A faculty member has two options in completing the annual review: (1) he may submit a FARAP using the existing FARAP form supplied by the Business School or (2) he may complete a resume that fully records his research for the preceding five years, service to the University and the Business School for the last academic year, and consulting for the last academic year.  The department chair reviews the submissions and discusses his comments with the faculty member.  The department chair also discusses with the dean his academic assessment of the FARAP materials submitted by the faculty member.  The dean shares his assessment with the chair.  The dean reviews the submissions and submits to the chair a one page review to be given to the faculty member.

Dean Boroff's FARAP summary notes indicated that the profile plaintiff submitted revealed that he had not published any refereed journal articles in the past two years and that,

-14-

NOT FOR PUBLICATION

accordingly, he needed to "complete a Released Time Contract for the 2001-2002 Academic Year to continue to earn a privilege of release time for research."  On October 22, 2001, plaintiff sent Dean Boroff an e-mail accusing her of discrimination and requesting that she stop requiring him to sign a release time contract.  On October 26, 2001 Dean Boroff responded to his e-mail, reminding him of his FARAP review.  She advised him that if he did qualify for release time, he should submit evidence of publishing in a refereed journal, full bibliographic entries and hard copies of the articles for the file.

Plaintiff asserts that on September 19, 2001 he informed Chairperson Dall that one of his peer-reviewed articles would be published in November 2001.  The generally accepted proof that an article had been accepted for publication is a letter of acceptance from the publisher.  Chairperson Dall denies that plaintiff provided him with a letter of acceptance from a publisher in September 2001.  Chairperson Dall conducted a database search and did not find that plaintiff had published any articles during the last half of 2001.  Plaintiff contends that he provided Dean Boroff as proof of publication: (1) a Copyright Assignment Form completed on August 31, 2001 and (2) "Information for Authors of Papers Accepted for Publication in The World Economy".

Plaintiff received a letter on August 19, 2001 from The World Economy indicating that the journal had accepted his article for publication.  He had adequate proof that his article had been accepted for publication but never provided it to defendant.  Defendant reviewed this letter for the first time on May 11, 2007 as an exhibit to plaintiff's reply submission.  Discovery had ended on March 2, 2007.

There is a genuine issue of material fact as to whether plaintiff established the second

-15-

**NOT FOR PUBLICATION**

element for a prima facie case for discrimination.  Unaware of plaintiff's acceptance letter,

defendant deemed plaintiff's representations and submission of two documents as inadequate

proof of publication, especially because his article was not published in November as he had

represented.  However, a reasonable jury could find that plaintiff's representations were credible

and that he qualified for release time.  See Shieh v. Lyng, 710 F. Supp. 1024, 1031 (E.D. Pa.

1989)(describing that the burden of establishing a prima facie case of national origin

discrimination as "modest").  The Court, resolving all doubt in plaintiff's favor, finds that

plaintiff has raised a genuine issue of material fact as to whether plaintiff was qualified.

  However, defendant argues that assigning plaintiff to teach four courses was reasonable at

the time of its decision because defendant reasonably believed, even if the belief is mistaken, that

plaintiff failed to produce evidence that he qualified for release time.  Fuentes, 32 F.3d at 764 -65

(stating that a plaintiff's showing that defendant's belief is mistaken is insufficient to prove

discriminatory animus).  Once the spring semester started, Dean Boroff believed that it would be

unfair and detrimental to the educational experience of the students to change instructors.

  By not providing plaintiff's letter of acceptance, plaintiff gives defendant's reasoning

additional legitimacy.  Defendant provided plaintiff ample opportunity to submit proof of

publication.  Rather than submitting the acceptance letter, which would be sufficient proof of

publication, plaintiff apparently kept the letter from defendant.  Defendant made reasonable

inquiries into whether plaintiff's article was published during the relevant time period.

Defendant made its decision to deny plaintiff's request for fringe benefits with incomplete

information.  Even though defendant's belief may have been based on mistaken or incomplete

NOT FOR PUBLICATION

information, plaintiff fails to present any evidence that a reasonable jury can conclude that defendant's reasons for denying his request for release time were a pretext for discrimination. Accordingly, defendant's motion for summary judgment on this allegation is granted.

### d.  Defendant Rejected Plaintiff's Application for Sabbatical

Plaintiff alleges that in January 2002, defendant rejected plaintiff's application for sabbatical because he had not served seven years of full-time service while granting sabbatical to non-Asian Indian faculty members with less than seven years of full-time service (Complaint ¶ 11).  Plaintiff applied for sabbatical for the 2002-2003 academic year having served six full years.  Normally, a faculty member is eligible for sabbatical leave after six full years of faculty service.  Article 6 of the <u>Faculty Guide</u> provides that a full-time faculty member may apply for sabbatical leave "for each period of six (6) years of full-time faculty service with the university, exclusive of time on leave."

According to defendant, plaintiff's eligibility requirements for sabbatical leave had been previously modified by an agreement between plaintiff and Provost Bernhard W. Scholz.  In the June 24, 1993 letter, Provost Scholz approved plaintiff's request for sabbatical for the 1993-1994 academic despite plaintiff having only served on the faculty for four full years.  Provost Scholz wrote: "I have decided to approve your sabbatical leave for the academic year 1993-1994, on the condition that your next sabbatical leave will come after seven years of full-time teaching at the earliest (rather than the six years the <u>Faculty Guide</u> provides)."  Dean Boroff concluded that based on the condition in Provost Scholz's grant of sabbatical leave for the 1993-1994 academic year plaintiff was eligible for sabbatical leave only after seven years of full-time service.

NOT FOR PUBLICATION

Plaintiff vehemently disagrees that he accepted the condition because he was unaware of the condition.  Plaintiff argues that he was eligible for his first sabbatical after fours years of service because the University had credited him with two years for previous work experience.  Article 6.1.a.5 of the Faculty Guide provides that "[u]p to two years of faculty service at another accredited institution of higher learning at an unqualified rank may be credited in the letter of appointment toward a faculty member's application for sabbatical leave."  Plaintiff presents a letter dated November 13, 1992 from Dean Kelly, claiming that Dean Kelly granted him a two year credit.  Dean Kelly wrote that "two years of your service elsewhere can be credited toward your first application for sabbatical leave here at Seton Hall University.  This presumes that the department is willing to approve your sabbatical under all of the normal expected conditions e.g. quality of proposal, ability to free up resource, etc."  From the content of the letter, it is unclear whether defendant actually credited plaintiff with two years.  Neither plaintiff nor defendant presented evidence as to whether plaintiff did receive credit for two years and whether he accepted Provost Scholz's condition.  There is a genuine issue of matter fact as to whether plaintiff was qualified for his request for sabbatical for the 2002-2003 academic year.

Defendant does not dispute that it had granted Prof. Tinari, who is not in plaintiff's protected class, his request for a sabbatical leave for the 2000-2001 academic year after less than four consecutive years of full-time faculty service.  Rather defendant argues the Prof. Tinari was eligible, because of his previously earned credit, and did not receive preferential treatment.  Prof. Tinari was eligible for sabbatical leave in Spring 1992 but delayed taking sabbatical until Fall 1994.  According to Article 6.1.a.3 of the Faculty Guide, Prof. Tinari was eligible for and did

-18-

NOT FOR PUBLICATION

receive credit towards his subsequent sabbatical by the period of his delay in taking an earlier sabbatical.  By the time Prof. Tinari took sabbatical leave in the 2000-2001 academic year, with the credit previously earned, Prof. Tinari had more than six years of credit for full-time faculty service.

Although there is a genuine issue of material fact as to whether plaintiff was eligible for sabbatical leave for the 2002-2003 academic year, defendant satisfies its low burden of presenting a legitimate reason for denying plaintiff's application.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)("The employer's burden at this stage is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action].").  Defendant's denial of plaintiff's application for sabbatical, regardless of whether defendant was mistaken about plaintiff's acceptance of Provost Scholz' condition, was reasonable because the denial was based on an allegedly, effective agreement between plaintiff and Provost Scholz.  Plaintiff has not presented any evidence for a reasonable jury to conclude that defendant's reasons were a pretext for any discrimination.  Accordingly, defendant's motion for summary judgment on this allegation is granted.

### e.    Defendant Intentionally Excluded Plaintiff from Faculty Award

Plaintiff alleges that in August 2002, defendant intentionally changed the criteria for the Faculty Excellence Award to exclude plaintiff from consideration for the award (Complaint ¶ 15).  During the 2001-2002 academic year, Dean Boroff consulted with faculty members and proposed guidelines to recognize the high level achievements of faculty members.  The Business School's Academic Standards Committee reviewed the criteria governing the awards.  Defendant

-19-

NOT FOR PUBLICATION

contends that Dean Boroff did not change an existing faculty award but rather created a new set of awards.  Plaintiff disagrees and lays out a list of changed criteria.

The Court is sensitive to avoid becoming a super review board for recognizing and setting standards for achievements of faculty members.  See Harel v. Rutgers, State Univ., 5 F. Supp. 2d 246, 271 (D.N.J. 1998).  The process of establishing the criteria for the faculty award seemed objective because Dean Boroff involved the faculty and the Academic Standards Committee. The Court finds it difficult to see how Dean Boroff, the faculty and the Academic Standards Committee conspired to establish new criteria with the intention to exclude plaintiff from receiving an award.  Without sufficient factual allegations that defendant's process for creating and reviewing the criteria for faculty awards was infected with defendant's discriminatory animus, the Court will not review defendant's process for setting standards for faculty awards. "Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." Kunda v. Muhlenberg Coll., 621 F.2d 532, 548 (3d Cir. 1980).  Accordingly, defendant's motion for summary judgment on this allegation is granted.

> **f.      Defendant Denied Plaintiff's Request of a Rating of "Outstanding"**

Plaintiff alleges that in October 2003, defendant denied plaintiff's request to rate his intellectual contributions for the 2002-2003 academic year as "outstanding" (Complaint ¶ 16).  In an e-mail dated June 4, 2003, plaintiff proposed to Chairperson Dall that his scholarship

**NOT FOR PUBLICATION**

deserved a rating of "outstanding."  In a memorandum dated June 12, 2003, plaintiff supported

his self-evaluation of "outstanding" because The World Economy published one of his articles.

Chairperson Dall rejected plaintiff's self-evaluation of "outstanding" and rated his intellectual

contributions as "exceeding standards."

In the FARAP process, publication in a top tier journal warrants an "outstanding" rating

for research.  However, plaintiff and Chairperson Dall disagreed as to whether The World

Economy was considered a top tier journal, although Chairperson Dall was willing to entertain

plaintiff's contention.  Plaintiff submitted a memorandum and supporting documents

demonstrating that The World Economy was top tier because out of 163 journals this journal was

within the top half of the most cited journals.  Chairperson Dall would have agreed with him that

The World Economy was a top tier journal if it ranked within the top quarter.  Because the

journal barely fell within the top half of the most cited journals, Chairperson Dall could not

conclude that it was a top tier journal and could not rate plaintiff's intellectual contribution as

"outstanding."

The Court is not a super review board for recognizing whether a journal that barely places

in the top half of most cited journals in the field of Economics as a top tier journal.  See Kunda,

621 F.2d at 548.  Chairperson Dall's assessment that The World Economy is not a top tier

journal is reasonable.  Because plaintiff published an article in a non-top tier journal, Chairperson

legitimately rated plaintiff's intellectual contributions for the 2002-2003 academic as "exceeding

standards."  Plaintiff has not presented any evidence that a reasonable jury can conclude that

defendant's reason was a pretext for unlawful discrimination.  Accordingly, defendant's motion

NOT FOR PUBLICATION

for summary judgment on this allegation is granted.

> g.    **Defendant Denied Plaintiff's Request for Reimbursements**

Plaintiff alleges that from 2001-2004, defendant repeatedly denied his request to present papers at professional conferences and refused to fully reimburse him for travel expenses while granting non-Asian Indian professors their requests for reimbursements (Complaint ¶ 18). Specifically, plaintiff asserts that defendant unlawfully failed to pay him for travel expenses: (1) in the amount of $198.00 for the ASSA conference in January 2001; (2) in the amount of $2,173.00 for a conference in February 2001; (3) in the amount of $700.00 for a Midwest Conference in May 2001 if plaintiff had been permitted to attend; (4) in the amount of $1,100.00 for the Lille conference in May 2001 if plaintiff had been permitted to attend; (5) in the amount of $724.00 for the Belfast conference in September 2001; and (6) in the amount of $1,405.00 for the London conference in June 2004 if plaintiff had been permitted to attend.

Defendant advances many reasons why plaintiff's travel expenses were either denied or only partially reimbursed.  The Business School allocates a pre-determined amount of travel funds each year for approved travel for each full-time faculty member.  The chair reviews and approves proposed expenditures out of allocated travel funds for faculty members in the Department of Economics within the assigned budget.  Faculty members may apply for supplemental funding for international travel from the Institute for International Business, an institute within the Business School.  The chair of the Department of Economics has no role in funding decisions by the Institute for International Business.

Dean Boroff reimbursed plaintiff for one-third of plaintiff's expenses incurred when he

**NOT FOR PUBLICATION**

attended the ASSA conference because he affiliated his conference materials with two other institutions. Dean Boroff felt that if defendant had supported plaintiff's participation in the ASSA conference at 100%, plaintiff should have affiliated himself with defendant at 100%. Dean Boroff suggested that plaintiff seek reimbursement of the remaining two-thirds of his expenses with the other institutions or affirm in writing that "only Seton Hall University was indicated as [his] affiliated institution in every manner, shape or form, and word at the ASSA Meetings of January 2001" for full reimbursement by the University. Plaintiff refused to affirm because he had presented research previously funded by the two institutions at the ASSA conference. Plaintiff believed that it would be unethical to omit their affiliation. Neither could agree as to the proper amount for plaintiff's reimbursement.

Defendant also denied plaintiff's request for travel expenses to the Midwest conference in Wisconsin and the Lille conference in France of May 2001 for several reasons. Plaintiff failed to list these conferences in his FARAP plan. These conferences did not meet the funding requirements for prestige. The amounts exceeded approved allocation. Because plaintiff's request for travel expenses were neither pre-planned nor pre-approved, defendant denied his request. Defendant funded plaintiff's travel expenses to the Belfast conference in September 2001 up to the $667 limit.

Defendant denied plaintiff's request for the additional reimbursement of $724, which was the balance of his costs, for a number of reasons. Plaintiff had exhausted his authorized travel funding for the year. The Business School exhausted its budget for travel expenses for the year. Defendant did not consider the Belfast conference as a prestigious economics conference.

-23-

**NOT FOR PUBLICATION**

Plaintiff could have requested additional funding from the Institute for International Business.

Defendant also denied plaintiff's request for approval to attend a London conference in June

2004.

Defendant presented a list of reasons why plaintiff's requests for travel reimbursement

were either denied or partially reimbursed.  In each case, defendant present valid reasons.

Plaintiff has not presented any evidence to permit a reasonable jury to conclude that defendant's

reasons were a pretext for discrimination.  Accordingly, defendant's motion for summary

judgment on this allegation is granted.

> **h.      Defendant Denied Plaintiff's Request for Partial Compensation**

Plaintiff alleges that in April 2000, defendant denied his request for partial compensation

during fellowship leaves while compensating a non-Asian Indian faculty member at half his

salary (Complaint ¶ 20).  By letter dated April 8, 2000, plaintiff requested compensation at 25%

of his regular salary during his 1999-2000 and 2000-2001 leaves of absence based upon the

assertion that "another faculty member in [his] department gets 50% salary and has been released

from all his service obligations, one-third of his normal teaching, and (maybe) all his research

obligations so that he can pursue his consulting interests."  The person plaintiff identifies as

being favorably compensated and not in his protected class is Professor Tinari.

Defendant provided evidence that Prof. Tinari was not on a leave of absence during the

relevant period but rather was compensated under a Reduced Compensation Agreement with the

University.  Under the Reduced Compensation Agreement, Prof. Tinari was obligated to teach

two courses per semester in exchange for half his regular pay plus benefits for the life of the

**NOT FOR PUBLICATION**

agreement.

Besides comparing himself to Prof. Tinari, plaintiff presents no other basis, such as a contractual agreement, why he is entitled to partial compensation during his leaves of absence. Because plaintiff has not presented any evidence that a reasonable jury can conclude that defendant's reasons were a pretext for discrimination. Accordingly, defendant's motion for summary judgment on this allegation is granted.

### 2.    Retaliation Claims

Plaintiff alleges that defendant retaliated against him because had filed charges with the EEOC on June 14, 1999 and filed a lawsuit, Kant I, on October 23, 2000 against defendant. Plaintiff must allege facts supporting the following elements for a prima facie case for retaliation: (1) that he was engaged in protected activity; (2) that the employer took an adverse employment action against him; and (3) that there was a causal connection between his protected activity and the adverse employment action.  Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995). Retaliation claims are subject to the same McDonnell Douglas burden-shifting framework as discrimination claims. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).

Each of plaintiff's allegations satisfies the first element because filing charges with the EEOC and filing a lawsuit are protected activities.  See Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).  Neither plaintiff nor defendant discusses the sufficiency of plaintiff's case on the second element.   Instead defendant argues that plaintiff fails to establish the third element and/or he fails to meet his burden of proof in rebutting defendant's legitimate reasons for its action.

-25-

NOT FOR PUBLICATION

As to the third element, an inference of a causal connection between the protected activity and the adverse employment action may arise from the timing of events alone.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (temporal proximity alone can be the basis for causal connection in prima facie retaliation case, as can temporal proximity "plus" other evidence; inquiry as to whether events are sufficiently close in time is fact specific); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177-78 (3d Cir. 1997)(four-month period between protected activity and adverse employment action may give rise to causal connection for purposes of establishing prima facie case).  However, with the passage of time, the inference of a causal connection becomes more tenuous.  Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 894-95 (3d Cir. 1993); see also Krouse, 126 F.3d at 503-04 (finding nineteen months between filing of EEOC charges and adverse action was too attenuated to create a genuine issue of fact on summary judgment).

> a.    Discrimination Claims as Retaliation Claims

The facts and circumstances of plaintiff's discrimination claims discussed earlier are incorporated into the Court's discussion of plaintiff's retaliation claims.  The Court will treat each of the allegations for discrimination as retaliation claims.  Claims for retaliation under § 1981 require the same application of the McDonnell Douglas burden-shifting framework as claims for discrimination.  See Lin v. Rohm & Haas Co., 293 F. Supp. 2d 505, 517 (E.D. Pa. 2003).  Because the Court found that defendant presented legitimate reasons for denying plaintiff's requests and plaintiff failed to rebut with direct or circumstantial evidence that defendant's reasons were a pretext, plaintiff's above claims for retaliation fail for the same

-26-

**NOT FOR PUBLICATION**

reasons plaintiff's claims for discrimination failed.  Accordingly, defendant's motion for

summary judgment on these allegations of retaliation is granted.  Plaintiff's remaining claims for

retaliation are analyzed below.

> **b.      Defendant Issued Warnings to Plaintiff**

Plaintiff alleges that in February 2002, defendant unreasonably issued him a written

warning of dismissal.  He also alleges that in March 2002, defendant unreasonably issued a

"memo of caution" (Complaint ¶ 12).

Dean Boroff believed that plaintiff crossed the line of acceptable behavior when he

represented without sufficient proof that his article would be published in the November 2001

issue of The World Economy and asserted, despite a series of signed contracts, that plaintiff was

promised that he would not be required to teach more than three courses per semester.  On

February 12, 2002, Dean Boroff sent plaintiff a memorandum warning him that he "falsified [his]

credentials by [his] assertion" that one of his articles "will be/has been published in November

2001 of The World Economy" and that he "falsi[fied] the terms of [his] appointment" by his

assertion that Chairperson Tzannetakis "promised [him] in writing that [his] teaching load shall

not exceed 9 hours per week."  Dean Boroff warned plaintiff that "[i]f an infraction such as those

listed in Article 3.7 occurs again, or any other violation of University policy, [he] could face

disciplinary action up to and including dismissal."

On March 18, 2002 Chairperson Dall issued a memorandum to plaintiff emphasizing the

importance of recruiting assignments to the University and that he would be held accountable for

performing his assigned job functions.  Plaintiff received notice that he was assigned to represent

**NOT FOR PUBLICATION**

the Department of Economics at an open house recruiting event scheduled for February 28, 2002.

The event was rescheduled to March 6, 2002.  Dean Boroff sent an e-mail on January 23, 2002 to

all Business School faculty members notifying them of this change and that faculty members

assigned to the February 28 open house were reassigned to the March 6 open house.  Plaintiff

complains that he never received notice of the calendar change.  Plaintiff had asked Dr. Paula

Alexander, Chair of the Faculty Association for the Business School and Dolores Condon, Dean

Boroff's secretary about the February 28 open house.  Neither knew about the new date.  Plaintiff

did not follow up further.  Plaintiff failed to appear at the March 6 open house.  No representative

from the Department of Economics showed up to field questions from prospective students.

After realizing that he missed the open house, plaintiff offered to represent the Department of

Economics at the next open house.  Chairperson Dall explained that he sent the memorandum to

simply admonish him to be more careful.

Even though neither party disputes the second element, the Court must examine the

sufficiency of proof for every essential element of plaintiff's claim on a motion for summary

judgment.  Celotex, 477 U.S. at 322-23.  Plaintiff's failure to support an essential element of his

claim entitles defendant a grant of summary judgment.  Id.  The second element for a claim for

retaliation requires that plaintiff suffered an adverse employment action.  In Burlington Northern

& Santa Fe Railway. Co. v. White, the Supreme Court stated that "the anti-retaliation provision

protects an individual not from all retaliation, but from retaliation that produces an injury or

harm."  --- U.S. ---, 126 S. Ct. 2405, 2415 (2006).  The Supreme Court wanted to separate

materially adverse harms from trivial harms.  Id.  A plaintiff must show that a reasonable

-28-

**NOT FOR PUBLICATION**

employee would have found the defendant's alleged retaliatory action materially adverse and that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. Because Dean Boroff's and Chairperson Dall's memoranda were simply letters of caution, defendant's actions did not amount to the type of adverse harm required for a retaliation claim. See DeHart v. Baker Hughes Oilfield Operations, 214 Fed. Appx. 437, 442 (5th Cir. 2007)(written warning for insubordination, for being argumentative, and for excessive absenteeism was not materially adverse for a claim for retaliation). Accordingly, defendant's motion for summary judgment on this allegation is granted.

   **c.**  **Defendant Unlawfully Imposed Research Obligations on Plaintiff**

   Plaintiff alleges that in March 2000, defendant imposed research obligations on him during his unpaid leaves of absence while failing to impose the same obligations on non-Asian Indian faculty members during their unpaid leaves of absence (Complaint ¶ 19). Plaintiff wrote to Dean Martin on March 4, 2000 requesting to be considered for leave with half pay because he planned to take a two-year leave of absence for research and professional development. Plaintiff argued that his special circumstances warranted the receipt of compensation from the University during his leave of absence. In Dean Martin's absence, in a March 20, 2000 letter, Dean Boroff, then Associate Dean, responded to plaintiff stating that his "research obligations are the same ones as those for all Stillman faculty." Dean Boroff believed that the obligation to conduct scholarly research was the pre-existing obligation of all faculty members and that plaintiff had no special research obligations that other faculty members did not have. Defendant argues that Dean Boroff did not impose special research obligations on plaintiff but rather explained to him why

-29-

**NOT FOR PUBLICATION**

his request for partial pay during his leave of absence was denied.

Similar to Dean Boroff's warning letter and Chairperson Dall's memo of caution, Dean Boroff's response to plaintiff explaining his research obligations does not amount to a materially adverse employment action. Plaintiff has not presented any evidence that a reasonable jury can conclude that defendant imposed special research obligations on him. Accordingly, defendant's motion for summary judgment on this allegation is granted.

### d.      Defendant Failed to Evaluate Plaintiff's Research Activities

Plaintiff alleges that in June 2002, defendant failed to evaluate his research activities for the 2001-2002 academic year while having evaluated the research activities of non-Asian Indian faculty members (Complaint ¶ 13).  On July 24, 2002, Dean Boroff forwarded to Chairperson Dall a document summarizing her discussion with plaintiff concerning his annual review for the 2001-2002 academic year.  The summary document included a discussion of plaintiff's research, but did not include a formal rating by Dean Boroff.  Dean Boroff evaluated plaintiff's research activities but failed to give him a formal rating.  Plaintiff argues that the lack of formal rating hurt his chances of receiving a faculty award.

Defendant explains the omission as Dean Boroff "simply forg[etting] to include a formal rating."  Dean Boroff has omitted formal ratings for other faculty members of the same race and/or national origin as plaintiff.  Plaintiff has not demonstrated how defendant's reason for failing to provide a formal rating was a pretext for discrimination.  Plaintiff has not presented any evidence that a reasonable jury can conclude that a causal connection existed between defendant's failure to provide plaintiff with a formal rating, which occurred more than one and a

-30-

NOT FOR PUBLICATION

half year later, and his protected activity.  Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (finding no causal connection when alleged retaliatory action occurred nearly a year after protected activity).  Accordingly, defendant's motion for summary judgment on this allegation is granted.

> **e.      Defendant Interfered with Plaintiff's Application to Columbia University**

Plaintiff alleges that in June 2002, defendant interfered with his application for a tenure position at Columbia University by alerting Columbia of plaintiff's lawsuit against the University (Complaint ¶ 14).  Only defendant is moving for summary judgment on this allegation.

Dean Boroff and Chairperson Dall denied having any knowledge that plaintiff was seeking employment with Columbia University in 2002.  Defendant correctly points out that plaintiff has produced no evidence to suport the allegation that anyone in the University communicated to Columbia University regarding his lawsuit against defendant.  Because plaintiff has not presented any evidence that a reasonable jury can conclude that defendant engaged in the alleged misconduct, plaintiff cannot establish the second element for a prima facie retaliation claim–that the employer took an adverse action against him.  Accordingly, defendant's motion for summary judgment on this allegation is granted.

> **f.      Defendant Excluded Plaintiff's Contribution from Annual Report**

Plaintiff alleges that in October 2003, defendant excluded his intellectual contributions from the Business School's Annual Report (Complaint ¶ 17).  Every year defendant issues the Annual Report for the previous academic year relating to the scholarship of the Department of Economics faculty.  Annual reports tend to be works-in-progress.  The Dean's office requests

NOT FOR PUBLICATION

faculty members to update their profiles and review updated draft compilations of the intellectual

contributions of the faculty.   The Business School's administrative staff processes the

information and submits it to the Dean for review.  Faculty members frequently miss the

submission deadlines, submit information at the eleventh hour, supply incomplete information,

etc.  The Annual Report is repeatedly updated and corrected.  Plaintiff's intellectual contribution

for the 2002-2003 academic year were omitted in the revised pages for the Annual Report on

October 8, 2003.

Defendant explains that plaintiff's intellectual contributions, along with intellectual

contributions of many other faculty members, were unintentionally omitted.  Defendant argues

that the process for including faculty member's intellectual contributions in the Annual Report is

imperfect and any omission is not a reflection of discriminatory intent.

Plaintiff has not presented any counter evidence that a reasonable jury can conclude that

causal connection existed between his protected activity and defendant's failure to include

plaintiff's intellectual contribution in the Business School's Annual Report, which occurred

almost three years after plaintiff's filing of Kant I.  Accordingly, defendant's motion for

summary judgment on this allegation is granted.


C.      **Title VII of the Civil Rights Act of 1964**

In the second count of the complaint, plaintiff alleges that defendant discriminated against

and retaliated against him in violation of Title VII, because of plaintiff's race and national origin.

Plaintiff repeats the same factual allegations in the second count as in the first count.

**NOT FOR PUBLICATION**

In order for a plaintiff to bring a civil action under Title VII, he must satisfy the non-jurisdictional prerequisites of timely filing a charge with the EEOC and receipt of notification by the EEOC of the employee's right to sue.  Commc'ns Workers of Am. v. New Jersey Dep't of Pers., 282 F.3d 213, 216-17 (3d Cir. 2002).  In deferral states where a state agency has authority to grant or seek relief from unlawful employment practices, plaintiffs have 300 days from the time of the alleged unlawful employment practice to file a charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5(e)(1); Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000).  New Jersey is a deferral state.  Cortes v. Univ. of Med. & Dentistry, 391 F. Supp. 2d 298, 307 n.2 (D.N.J. 2005).

     **1.**     **Timeliness**

Defendant argues that many of plaintiff's claims are time-barred because the alleged conduct occurred more than 300 days before the filing of the EEOC charge.  There is some disagreement as to when plaintiff properly filed his charge of discrimination with the EEOC.  Plaintiff filed an unperfected charge of discrimination with the EEOC on November 4, 2002 and a formal charge of discrimination on November 18, 2002.  The two dates are important because two of defendant's allegedly unlawful employment action occurred between January 8, 2002 and January 22, 2002, which are 300 days before November 4, 2002 and November 18, 2002, respectively.

Initially defendant argued that November 18, 2002 was the date plaintiff properly filed a charge of discrimination with the EEOC.  In a September 5, 2007 letter to the Court, defendant withdrew the "limited aspect of its motion for summary judgment that seeks dismissal on

NOT FOR PUBLICATION

timeliness grounds of Plaintiff's Title VII allegations concerning the January 10, 2002 and

January 14, 2002 incidents referenced in [Plaintiff's] EEOC Charge and Amended Complaint."

Defendant confirmed to its satisfaction the authenticity of an EEOC acknowledgment form and

an EEOC (unperfected) Notice of Charge of Discrimination, both dated November 4, 2002.

 The Court finds that November 4, 2002 is the date when plaintiff filed his charge of

discrimination for the following reason.  Notice to the EEOC may constitute a charge that

satisfies the requirement of 29 U.S.C. § 626 if the notice "would convince a reasonable person

that the grievant has manifested an intent to activate the Act's machinery."  Bihler v. Singer Co.,

710 F.2d 96, 99 (3d Cir. 1983).  Plaintiff's unperfected charge, EEOC in-take questionnaire and

the EEOC acknowledgment form are sufficient evidence for a reasonable juror to conclude that

he intended to pursue a complaint of discrimination against the defendant as of November 4,

2002.

  **2. Continuing Violation Doctrine**

 Plaintiff argues that alleged acts that occurred more than 300 days before the filing of his

EEOC charge are assertable under the continuing violation doctrine.  Under the continuing

violation doctrine, a plaintiff may pursue a Title VII claim for discriminatory conduct that began

before the limitations period if he can demonstrate that the act is part of an ongoing practice or

pattern of discrimination by a defendant.  West v. Phila. Elec. Co., 45 F.3d 744, 754 (3d Cir.

1995).  To demonstrate a continuing violation, a plaintiff must show that at least one

discriminatory act occurred within the 300 day period and prove that the alleged unlawful

employment practice was not an isolated or sporadic set of acts but rather a continuing pattern of

-34-

NOT FOR PUBLICATION

discrimination.  Rush v. Scott Specialty Gases, 113 F.3d 476, 481 (3d Cir. 1997).

However, a discrete discriminatory act is "not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  "Each discrete discriminatory act starts a new clock for filing charges alleging that act."  Id.  Acts such as termination, failure to promote, denial of benefits, refusal to hire, letters of warning and performance evaluations are discrete acts that if not included in the statutory period for filing a complaint are time-barred.  Miller v. N.H. Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002).

The Third Circuit has adopted the Fifth Circuit's enumeration of factors supporting the determination of a continuing violation theory:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert []his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

Rush, 113 F.3d at 482 (quoting Berry v. Bd. of Supervisors of La. State Univ., 715 F.2d 971, 981 (5th Cir. 1983)).

Many of plaintiff's alleged acts of discrimination occurred more than 300 days before November 4, 2002, or January 8, 2002.  Plaintiff alleged that in January 2001, defendant denied his request for benefits while on a leave of absence (Complaint ¶ 8).  In December 2001, Dean Boroff recommended against plaintiff's request for an unpaid leave of absence for the 2002-2003

-35-

NOT FOR PUBLICATION

academic year (Complaint ¶ 9).  During 2001, Dean Boroff and Chairperson Dall repeatedly

denied plaintiff's requests to present papers at professional conferences or refused to reimburse

him for authorized travel expenses (Complaint ¶ 18).  Specifically, defendant failed to reimburse

him for travel expenses incurred in January 2001 for the ASSA conference, various travel

expenses submitted in February 2001, travel expenses plaintiff would have incurred if permitted

to attend a Midwest conference in May 2001, travel expenses plaintiff would have incurred if

permitted to attend a Lille Conference in May 2001, and travel expenses incurred for the Belfast

Conference in September 2001.

Dean Boroff, in a letter dated Mach 20, 2000, imposed research obligations during

plaintiff's unpaid leaves of absences (Complaint ¶ 19).  Dean Boroff, in a letter dated April 8,

2000, denied him partial compensation during the 1999-2001 academic year (Complaint ¶ 20).

Plaintiff and defendant dispute whether plaintiff was on an unpaid leave of absence or on a

fellowship leave during 1999-2001 period.  Each of these acts is discrete and has the degree of

permanence as to alert the plaintiff of his need to assert his rights.

Plaintiff was well aware of his rights under Title VII at the time these allegedly

discriminatory acts were committed.  This case is the second of two cases filed by plaintiff

against defendant for employment discrimination and retaliation in violation of Title VII.  Earlier

plaintiff had filed with the EEOC a charge of discrimination on June 14, 1999 and a related civil

action on October 23, 2000.  Plaintiff understands the prerequisite of filing an EEOC charge of

discrimination before he may bring a lawsuit.  Plaintiff cannot argue that these alleged acts did

not alert him of the need to assert his rights.  All of the above allegations of unlawful

-36-

**NOT FOR PUBLICATION**

employment practices in violation of Title VII that occurred 300 days before November 4, 2002,

or January 8, 2002, are dismissed for untimeliness.

### 3.  Scope of the EEOC Charge of Discrimination

Defendant argues that only two of plaintiff's allegations were present in the EEOC charge

of discrimination and all new allegations are outside the reasonable scope of the charge.  The two

charges included in the EEOC charge were (1) defendant unlawfully assigned plaintiff to teach

four courses (Complaint ¶ 10) and (2) defendant unlawfully rejected plaintiff's application for

sabbatical leave (Complaint ¶ 11).  Defendant cites to Waiters v. Parsons for the proposition that

allegations of unlawful conduct not included in the charge of discrimination or reasonably within

the scope of the charge should be dismissed.  729 F.2d 233, 237 (3d Cir. 1984).  In Waiters, the

Third Circuit permitted the plaintiff to bring claims based on new acts that occurred "during the

pendency of the case which are fairly within the scope of an EEOC complaint or the investigation

growing out of that complaint, without requiring the victim to file additional EEOC complaints

and wait another 180 days to sue."  Id.  Plaintiff alleges that these acts were in retaliation for the

charges of race and national origin discrimination filed by the plaintiff (Complaint ¶ 24).  These

allegedly unlawful acts are reasonably within the scope of the charge because they relate to

plaintiff's assertion that these acts were motivated by retaliation against the him.  The statutory

scheme of Title VII is not furthered if a plaintiff has to file a new EEOC charge of discrimination

and a new lawsuit every time a defendant commits a new, alleged act of discrimination.  Waiters,

729 F.2d at 237.  All allegations of retaliation not time-barred are considered to be within the

scope of the charge.

NOT FOR PUBLICATION

**4.      Discrimination Claims and Retaliation Claims**

In the Third Circuit, "the elements of employment discrimination under Title VII  are identical to the elements of a [§] 1981 claim."  Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999).  The elements of a retaliation claim under § 1981 are parallel to those of a retaliation claim under Title VII  and the NJLAD.  See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  Claims raised under § 1981 are analyzed in accordance with the same McDonnell Douglas burden-shifting framework as those raised under Title VII.  Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 385 (3d Cir. 1999).  Because plaintiff's claims for discrimination and retaliation under Title VII arise out of the same facts and circumstances as his § 1981 claims, his Title VII claims fail for the same reasons as his § 1981 claims failed.  Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 97 (3d Cir. 2005) ("Because [plaintiff's] Section 1981 discrimination and retaliation claims are based on the same incidents and analyzed under the same standards as those of his coordinate Title VII  claims, these claims fail for the same reasons the Title VII  claims failed.").

Accordingly, the Court grants defendant's motion for summary judgment on all of plaintiff's discrimination and retaliation claims under Title VII.

**D.      New Jersey Law Against Discrimination**

Plaintiff repeats the same factual allegations in the fourth count as in the first count of the complaint.  However, it is unclear what types of claims plaintiff is asserting in the fourth count. Throughout the complaint he alleges that defendant discriminated and retaliated against him.

-38-

NOT FOR PUBLICATION

Plaintiff mentions for the first time a hostile environment claim under NJLAD in his opposition to defendant's motion for summary judgment.  Neither party briefed the issue of a hostile work environment, but both parties briefed the issues for discrimination and retaliation under NJLAD. Plaintiff's claim for hostile work environment is dismissed for his failure to assert it in the amended complaint.  See Armstrong v. Reno, 172 F. Supp. 2d 11, 20 (D.D.C. 2001)(dismissing plaintiff's claim of constructive discharge because it was alleged for the first time in plaintiff's opposition to defendant's motion for summary judgment and not alleged in plaintiff's complaint). The Court will treat plaintiff's factual allegations under the NJLAD as claims for discrimination and retaliation.

### 1.    Continuing Violation Doctrine

Plaintiff filed this complaint on December 23, 2003.  Claims brought under the NJLAD are subject to a two-year statute of limitations.  Montells v. Haynes, 133 N.J. 282 (1993). Defendant argues that many of plaintiff's allegations under the NJLAD are time-barred because Defendant's alleged acts occurred before December 23, 2001, two years before plaintiff's filing. Plaintiff answers that all factual allegations outside the two-year period should be included under the continuing violation doctrine because defendant's actions were a continuous course of retaliatory conduct.  Under New Jersey law, the continuing violation doctrine relieves plaintiffs from statutes of limitations for acts constituting a "continuous course of conduct that ends within the limitations period." Hall v. St. Joseph's Hosp., 343 N.J. Super. 88, 101 (App. Div. 2001)

To ascertain whether an alleged event is part of a continuing violation, the Court considers: (1) whether "plaintiffs alleged one or more discrete acts of discriminatory conduct by

-39-

NOT FOR PUBLICATION

defendants," or (2) whether "plaintiffs alleged a pattern or series of acts, any one of which may

not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work

environment." Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 21 (2002). The equitable

foundation underlying the continuing violation doctrine does not apply to discrete claims,

because the victim "should have known" that defendant's conduct was discriminatory at the time

it occurred. Hall, 343 N.J. Super. at 103. The law does not permit plaintiffs to "sit back and

accumulate all the discriminatory acts and sue on all within the statutory period applicable to the

last one." Id.

      As stated in the Court's analysis of the application of the continuing violation doctrine to

plaintiff's Title VII claim, his factual allegations are discrete, and he was well aware of his right

to sue for discrimination and retaliation. There are some factual disputes as to when defendant's

alleged conduct occurred. For the purposes of a motion for summary judgment, all doubt as to

when an alleged act occurred will be resolved in plaintiff's favor. All allegations where

defendant's allegedly unlawful conduct occurred before December 23, 2001 are time-barred. The

critical cut-off date for filing claim under Title VII (January 8, 2002) and under the NJLAD

(December 23, 2001) are roughly two weeks apart. Coincidentally, the allegations that fail for

untimeliness under Title VII are the same allegations that fail for untimeliness under the NJLAD.

    **2.**      **Discrimination and Retaliation Claims**

      Defendant simply argues that plaintiff's NJLAD are deficient as a matter of law for the

same reasons his § 1981 claims are deficient. The legal standards and the burdens of proof for

establishing claims under Title VII, § 1981 and the NJLAD are the same. Cardenas, 269 F.3d at

NOT FOR PUBLICATION

251 (applying the same three-part test for a prima facie case for retaliation under Title VII, §

1981 and the NJLAD); Waldron v. SL Indus., 56 F.3d 491, 503 (3d Cir. 1995) (stating that the

NJLAD is "governed by the same standards and burden of proof structures applicable under Title

VII of the Civil Rights Act of 1964"); Silvestre v. Bell Atlantic Corp., 973 F. Supp. 475, 481

(D.N.J. 1997)("The New Jersey courts have interpreted the proofs and burdens of persuasion for

discrimination under the New Jersey Law Against Discrimination [] in the same manner as that

under Title VII  of the Civil Rights Act of 1964.").  Because plaintiff's claims for discrimination

and retaliation under NJLAD arise out of the same facts and circumstances as his § 1981 claims,

his NJLAD claims fail for the same reasons as his § 1981 claims failed.

Accordingly, the Court grants defendant's motion for summary judgment on all of

plaintiff's discrimination and retaliation claims under NJLAD.


**E.      Breach of Contract**

In the third count of the amended complaint, plaintiff alleges that defendant breached its

contractual obligations to him by requiring him to serve seven (instead of six) years before being

approved for sabbatical, by requiring him to teach four courses during the Spring 2002 semester

and by failing to provide him fringe benefits during his 1999-2000 and 2000-2001 leaves of

absence.  Neither party marshals the facts, the evidence, and New Jersey contract law to properly

argue this issue under New Jersey contract law.  The Court finds it difficult to decide this issue

on summary judgment.

When claims over which a court has original jurisdiction have been dismissed on

NOT FOR PUBLICATION

summary judgment, a court can decline to exercise jurisdiction over supplemental state claims

unless extraordinary circumstances exist.  28 U.S.C. § 1367(c) ("The district courts may decline

to exercise supplemental jurisdiction over a claim under subsection (a) if-the district court has

dismissed all claims over which it has original jurisdiction"); <u>see</u> <u>Hedges v. Musco</u>, 204 F.3d

109, 123 (3d Cir. 2000) (upholding district court's decision to refuse to exercise supplemental

jurisdiction over remaining state law claims and recognizing that "where the claim over which

the district court has original jurisdiction is dismissed before trial, the district court must decline

to decide the pendent state claims unless considerations of judicial economy, convenience, and

fairness to the parties provide an affirmative justification for doing so").  This Court declines to

exercise jurisdiction over these state claims.  Plaintiff's claims for breach of contract will be

dismissed without prejudice and, pursuant to 28 U.S.C. § 1367(d), the statute of limitations for

plaintiff to bring his claims for breach of contract in state court will be tolled for thirty days after

the date of dismissal.  <u>Hedges</u>, 204 F.3d at 123-24 (discussing tolling); <u>L-3 Commc'ns. Corp. v.</u>

<u>Clevenger</u>, No. 03-CV-3932, 2004 WL 1941248, at *6 (E.D. Pa. Aug. 31, 2004) (stating that

plaintiff had thirty days to re-file in state court where court declined to exercise supplemental

jurisdiction).

**CONCLUSION**

Accordingly, defendant's motion for summary judgment is granted as to the first count,

second count and fourth count of the amended complaint.  The third count is dismissed without

prejudice.  Pursuant to 28 U.S.C. 1367(d), the statute of limitations for plaintiff to bring his

**NOT FOR PUBLICATION**

claims for breach of employment contract in state court will be tolled for thirty days after the date

of dismissal.  Plaintiff's motion for partial summary judgment is denied as moot.


January 3, 2008                                                                    s/William H. Walls

                                                                                 **William H. Walls, U.S.S.J.**